# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ALYCE BROWN,
     Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-123

Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

     Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and Supplemental Security Income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 5), the Commissioner's response in

opposition (Doc. 8), and plaintiff's reply memorandum. (Doc. 9).

## I. Procedural Background

     Plaintiff filed applications for DIB and SSI on December 29, 2005, alleging disability

since July 7, 2003, due to a herniated disc and lumbar sprain/strain. Plaintiff's applications were

denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a

de novo hearing before ALJ Sarah Miller. Plaintiff and a vocational expert (VE) appeared and

testified at the ALJ hearing. On February 24, 2009, the ALJ issued a decision denying plaintiff's

DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied,

making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence

### A. Physical impairments

Plaintiff injured her back while lifting a patient at her job as a certified nurse's assistant (CNA) in July of 2003. (Tr. 173). She was subsequently incarcerated at the Ohio Reformatory for Women in Marysville, Ohio from 2004 through 2005. Dr. Walter Holbrook, M.D., examined plaintiff on behalf of the state agency in October 2004 during her incarceration in connection with a previous application for disability benefits.[1] (Tr. 173-179). Plaintiff complained of a herniated disc in her back at L5-S1; numbness in her left leg which caused her to limp; pain so severe she "could hardly get out of bed" some days; and stress incontinence. (Tr. 173-74). She had no psychiatric complaints. Plaintiff reported she had gone to urgent care after injuring herself while lifting a patient at work on July 7, 2003. According to plaintiff, she had MRIs, she went to physical therapy, and she received three epidural injections, none of which were successful. (*Id.*).

Dr. Holbrook listed plaintiff's weight as 187 pounds. His positive findings on physical exam included:

- "Trendelenburg gait[2], swings left leg, walks with a leg stiff, and touch is diminished."
- straight leg raising positive at 30 degrees on the left, 60 degrees on the right
- absent back lumbar curve
- very tender L5-S1 area
- spasm present
- left sciatic notch tender
- forward flexion 20 degrees, no extension

[1]This application was denied initially and was not appealed by plaintiff. (Tr. 18).

[2]The Trendelenburg gait is an abnormal gait caused by weakness of the abductor muscles of the lower limb, gluteus medius and gluteus minimus. http://encyclopedia.thefreedictionary.com/Trendelenburg+gait (last accessed 2/8/12).

- straight leg raising positive at 30 degrees on the left and 60 degrees on the right while in a seated position
- decreased leg reflexes

(Tr. 174-75). Dr. Holbrook's impression was lumbosacral injury with radiculopathy. (Tr. 175). He assessed plaintiff's residual functional capacity as lifting/carrying 10 pounds occasionally and 5 pounds frequently; standing/walking 3-4 hours; sitting 6 hours; and minimal stooping. (*Id*.).

State agency medical consultant Dr. Jerry McCloud, M.D., reviewed the file and completed a physical RFC assessment dated November 22, 2004. (Tr. 180-187). Dr. McCloud relied on Dr. Holbrook's findings of Trendelenburg gait, swinging-stiff leg, positive straight leg raising, tenderness at L5-S1, left sciatic notch spasm, and significantly limited dorsolumbar range of motion in rendering an RFC assessment that did not differ significantly from that issued by Dr. Holbrook. Dr. McCloud opined that plaintiff could occasionally lift/carry 10 pounds and frequently lift/carry less than 10 pounds; she could stand/walk at least 2 hours in an 8-hour workday; she could sit about 6 hours in an 8-hour workday; and she could occasionally climb ladders/ropes/scaffolds, stoop and crouch. (Tr. 181-82).

Plaintiff received chiropractic treatment for her back in January and February 2006 from Dr. Tim McCrossen. (Tr. 190-98). Plaintiff complained of lower back pain and left leg numbness. Dr. McCrossen reported decreased range of motion, grade 4/5 lumbar muscle strength, lumbar muscle spasms, and positive straight leg raising on the left. (Tr. 191, 193). Plaintiff reported some improvement following treatment, and Dr. McCrossen noted improved motion. (Tr. 192).

Plaintiff presented to the emergency room several times during 2006 with complaints of back pain:

3

- 3/16/06: Plaintiff complained of a flare up of her chronic back pain after being out of her pain medications for three weeks. She reported severe pain across her low back radiating into both legs. On physical exam, she was noted to be in some discomfort and had diffuse tenderness to palpation across the lumbar spine, but deep tendon reflexes were symmetric and intact, flexion of each foot was normal, and there was no saddle paresthesias or focal neurological deficit. She was diagnosed with "acute on chronic low back pain" and was prescribed Naprosyn, Flexeril, and Percocet as needed for pain. (Tr. 214-16). Plaintiff was to establish primary care for her back, use heat for the sore areas, and perform no heavy lifting or bending while the pain persisted. (Tr. 214-16).

- 7/15/06: Plaintiff complained of increased back pain but denied any radicular pain, numbness, or tingling. She complained of some left leg weakness. It was noted that she had not established herself with a family practice clinic as advised at the March emergency room visit and she was on no medications for her back, but she was seeing a chiropractor. There was tenderness to palpation over the left S1 joint, straight leg raising was positive on the left, and a slight decrease in toe, ankle, knee and left hip flexion/extension was noted. No neurological emergency was assessed and it was determined that no further imaging was indicated. The attending physician reported that he did not feel plaintiff's left leg weakness was "radicular in nature as it is kind of a global weakness and [plaintiff] was able to ambulate without difficulty in and out of the exam room with no apparent left leg weakness." (Tr. 212). The plan was to treat plaintiff with anti-inflammatories and Flexeril. (Tr. 211-13).

- 9/05/06: Plaintiff was seen for "black toes" and back pain and was diagnosed with bilateral toe pain that was unrelated to her back injury. (Tr. 218-20). It was reported that plaintiff had been seen within the last week at Fort Hamilton Hospital for back pain and was treated symptomatically with Motrin and Percocet. On physical examination, she had full range of motion of the hips and no tenderness to palpation of the lumbar spine. Neurological strength was 5/5. (Tr. 218-20).

Consultative examining physician Dr. Jennifer Bailey, M.D., evaluated plaintiff on May

17, 2006. (Tr. 202-08). Dr. Bailey reported that at 5 feet tall and 214 pounds, plaintiff was

"morbidly" and "massively" obese. (Tr. 202, 203). Plaintiff complained of back pain radiating

down the left leg, which she described as a "dull ache," and left leg weakness and numbness

which had caused her to fall in the past. (Tr. 202). Plaintiff stated the pain was exacerbated by

prolonged ambulating and lifting heavy objects. (*Id.*). Plaintiff apparently reported that she was

scheduled for an MRI the following week. (*Id.*). Plaintiff stated she was receiving chiropractic

care and the only medication she was taking was Remeron for depression. (*Id.*).

Dr. Bailey reported that plaintiff's mental status and intellectual functioning were normal,

although plaintiff had a flat affect. (Tr. 203). On physical examination, plaintiff ambulated with

a normal gait and was comfortable in both the sitting and standing positions. (*Id.*). There was no

evidence of muscle atrophy. (*Id.*). Deep tendon reflexes were brisk bilaterally. (*Id.*). There was

no tenderness on palpation of the hips. (*Id.*). She could stand on either leg and ambulate heel-to-

toe without difficulty. (*Id.*). Positive physical findings included the following:

- some mild kyphosis of the thoracic spine

- slight difficulty forward bending at the waist to 65 degrees

- evidence of paraspinous muscle spasm on the left

- straight leg raising was diminished to 30 degrees on the left

- lateral motion of the spine was diminished to 20 degrees on the right and 15 degrees on
the left

- there was numbness over the dorsum of the left thigh and gluteal region

(Tr. 203-04). Dr. Bailey diagnosed plaintiff with morbid obesity and chronic back pain with mild

left-sided radiculopathy. (Tr. 204). Dr. Bailey summarized her findings and conclusions as

follows:

> In summary, this is a morbidly obese young woman who states that she is unable
> to work due to chronic back pain radiating to the left leg. Her back examination
> suggests mild left-sided radiculopathy with a positive straight leg raise on the left
> and numbness over the dorsum of the left thigh. However, the patient ambulates
> with a normal gait and had slight difficulty forward bending at the waist. Obesity
> contributes to symptoms, and weight reduction would diminish her complaints.

> Based on the findings of this examination, the patient appears capable of performing a mild to moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects. . . .

(*Id.*).

An x-ray of plaintiff's lumbar spine taken on the date of the exam showed spina bifida occulta at S-1 but no other abnormalities.[3]  (Tr. 209).

State agency medical consultant Kathryn Drew reviewed the record and completed a physical RFC assessment on June 13, 2006.  (Tr. 432-439).  She found that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; never climb ladders/ropes/scaffolds; and occasionally stoop, kneel, crouch and crawl.  (Tr. 433-34).  She based her assessment on the findings of the consultative examiner, Dr. Bailey, that range of motion of the cervical spine was within normal limits; plaintiff could forward bend to the waist to 65 degrees; heel to toe ambulation was preserved and gait was normal; straight leg raising was positive at 30 degrees on the left; lateral motion of the spine was diminished to 20 degrees on the right and 15 degrees on the left; there was no evidence of muscle atrophy; there was numbness over the dorsum of the left thigh and gluteal region; all reflexes were brisk bilaterally; and lumbosacral x-rays showed spina bifida occulta at S-1.  (Tr. 433).  State agency medical consultant Dr. Lynne Torello, M.D., affirmed the RFC assessment as written on November 16, 2006.  (Tr. 431).  Dr. McCloud reaffirmed the RFC assessment on August 22, 2008, noting there was no new medical evidence

---

[3]"Spinal bifida occulta" is a developmental anomaly characterized by incomplete development of the spinal cord and/or the meninges (the protective covering around the spinal cord), though the defect is hidden by a layer of skin and rarely causes disability or symptoms.
http://www.medicinenet.com/spina_bifida_and_anencephaly/article.htm (last accessed 1/31/12).

since the prior decision that would alter the June 13, 2006 RFC assessment. (Tr. 430, 439).[4]

Dr. Jose Martinez, M.D., examined plaintiff on July 16, 2008.[5] (Tr. 390-91). Plaintiff reported that her pain was "4" on a "1-10" pain scale. The treatment plan consisted of obtaining an MRI of the lumbar spine; refilling plaintiff's pain medication; and considering physical therapy. Dr. Martinez noted that plaintiff was required to undergo urine drug testing (UDT) at the next office visit and to sign a pain management contract. (Tr. 391). He prescribed Percocet and Soma. The treatment notes reflect that plaintiff did not show for an August 15, 2008 scheduled office visit, and treatment notes for August 25, 2008, state only "UDT at next [office visit]" and indicate that plaintiff would receive no further treatment before undergoing urine drug testing. (*Id*.).

## B. Mental impairments

Plaintiff was seen at Greater Cincinnati Behavioral Health Services from 2006 to June 2008. (Tr. 392-429). At her first visit, Dr. Steven Poland, M.D., reported that plaintiff's chief complaints were crying spells, interrupted sleep, and decreased energy, appetite and concentration. (Tr. 420). Her stressors included inadequate housing, her husband's incarceration, the absence of her children, and chronic back pain. (*Id*.). The progress notes reflect her mood/affect was depressed but stable. (Tr. 421). She was diagnosed with "major depressive disorder single episode." (Tr. 422). She was assigned a GAF score of 55.[6] (*Id*.).

---

[4]The date of the initial RFC is erroneously listed as "6/13/08" rather than "6/13/06" in Dr. McCloud's affirmance. (Tr. 430).

[5]Some of Dr. Martinez' notes are illegible.

[6]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social,

7

Dr. Poland's progress notes from March 28, 2006, include diagnoses of major depressive disorder-single episode, PTSD by history, and polysubstance abuse in remission. (Tr. 416). Dr. Poland increased plaintiff's dosage of Remeron for depression. He reported that most of her depression was situational and would be relieved when she had stable housing and her children were returned to her. (*Id*.). He assigned her a GAF score of 55. (Tr. 418).

On May 8, 2006, Dr. Poland reported that plaintiff was now in her own apartment instead of living with her cousin, she reported she was sleeping much better, she had no crying spells, her energy was better, and she was getting out more. (Tr. 413). Plaintiff still complained of chronic back pain and reported that she might need surgery for her back. (*Id*.). Dr. Poland assigned her a GAF score of 60. (Tr. 415).

Dr. Poland completed a questionnaire on October 30, 2006, at the request of the state agency covering the period February 3, 2006 to May 8, 2006. (Tr. 392-94). In response to most of the questions, Dr. Poland referred to the progress notes. (Tr. 394-95). The only other information Dr. Poland provided was that he had last seen plaintiff on May 8, 2006, at which time she reported being stable form a psychiatric standpoint and had "minimal depressive signs," and her diagnoses were "major depression - single episode (more or less in remission at last visit 5/8/06)"; "History of PTSD - partial remission at last visit"; and polysubstance abuse - remission at last visit." (Tr. 394).

Plaintiff saw Dr. Poland approximately six weeks later on December 11, 2006. (Tr. 408).

_____

and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. *Id.* Individuals with scores of 51-60 are classified as having "moderate" symptoms. *Id.* The next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." *Id.*

He reported she had not been on her medications for more than three months. She had complaints of depression; racing thoughts; irritability; insomnia; decreased energy, appetite and concentration; crying spells; and hopelessness. She had significant stressors at the time, including the upcoming anniversary of her grandmother's death. Her mood was depressed but stable. Dr. Poland diagnosed plaintiff with major depressive disorder, polysubstance abuse in remission, and "R/O PTSD." (Tr. 410). Dr. Poland restarted plaintiff on Remeron and gave her samples of Lexapro. He assigned her a GAF score of 50. (*Id*.).

Plaintiff was taken to the University Hospital emergency room on December 14, 2006, after she attempted suicide by overdosing on Zanaflex. (Tr. 226-46). Plaintiff's diagnoses included Zanaflex overdose-suicide attempt, depression, chronic back pain, cocaine dependence, cocaine related chest pain, adjustment disorder, history of depression, and bipolar effective disorder. (Tr. 226). The history noted that plaintiff had a difficult social situation in that she was recently in prison and was unhappy with her housing, and she had taken an overdose of Zanaflex in a suicide attempt to seek attention from her husband after an argument. Plaintiff also tested positive for cocaine. She was discharged after four days and counseled to discontinue cocaine use and to follow up with psychiatry. (Tr. 226-27).

On January 5, 2007, plaintiff was taken by ambulance to the University Hospital emergency room for a TCA (tricyclic antidepressants) overdose. (Tr. 247-72). She also tested positive for cocaine. (Tr. 256). During the initial psychiatric consult on January 6, 2007, it was noted that plaintiff was on a police hold for stabbing her husband. (*Id*.). It was reported that plaintiff had severe marital problems and legal problems and had lost custody of her children. (Tr. 255). Plaintiff claimed she had relapsed on cocaine the prior day after being clean for two

9

years. (Tr. 256). Plaintiff's speech was normal, her thought processes were linear and goal directed, no delusions were noted, her mood was "depressed/restricted, congruent," and her insight and judgment were "marginal/severely impaired." (Tr. 255). She was diagnosed with major depressive disorder and substance abuse. (*Id.*). Plaintiff was discharged to the psychiatry department for further inpatient treatment when a bed became available on January 8, 2007. (Tr. 247).

Plaintiff was seen by Dr. Tracey Skale, M.D., at Greater Cincinnati Behavioral Health Services following her hospitalizations. (Tr. 404-06). On January 22, 2007, Dr. Skale diagnosed plaintiff with moderate to severe major depression, recurrent; PTSD; and cocaine abuse. (Tr. 404). Plaintiff's symptoms included depressed mood, crying spells and anhedonia. (*Id.*). Dr. Skale continued plaintiff on Remeron. (Tr. 405). She assigned plaintiff a GAF score of 49. (Tr. 406). The following month, plaintiff reported that things were looking up and that she was happy. (Tr. 401). Dr. Skale noted some improvement in plaintiff's mood, although plaintiff still experienced some depressive feelings and crying. (*Id.*). Dr. Skale diagnosed plaintiff with mild major depression, recurrent; cocaine abuse (negative since December); and PTSD. (*Id.*). Dr. Skale prescribed Cymbalta and Rozerem, a sleep aid, to temporarily help with sleep. (Tr. 402). She noted there was no change in plaintiff's GAF score from the last visit. (Tr. 403).

Plaintiff was subsequently incarcerated in 2007 and 2008. In August 2007, she requested mental health services and a mental health treatment plan was formulated by Dr. Amy Merker, M.D. (Tr. 341-43, 355). Plaintiff reported racing thoughts, being tearful four times a week for two months, poor concentration, problems with focusing, agitation, poor sleep, poor motivation, a history of elevated mood, and mood swings. (Tr. 343). She was diagnosed with bipolar I

disorder and cocaine dependence. (Tr. 341). Plaintiff was assigned a GAF score of 63. (*Id.*).

Plaintiff received mental health counseling and medications, including Depakote and Lithium, during her incarceration. (Tr. 313). Treatment notes from September 18, 2007, reflect that plaintiff reported experiencing some relief in response to resolution of certain legal problems and her mood was more stable, her concentration was improved, her racing thoughts had decreased, and she was more calm overall. (Tr. 352). She was coherent and her mood and affect were within normal limits. (*Id.*). According to treatment notes dated October 9, 2007, plaintiff reported that she was "very good" and was experiencing no side effects from her medicine, no racing thoughts, and no crying spells. (Tr. 352).

In June 2008, following her release from prison, plaintiff presented to the psychiatric emergency unit at University Hospital to obtain refills of her medication, which she had run out of four days earlier. (Tr. 364-370). She was prescribed Depakote and Cymbalta. (Tr. 370).

In August 2008, plaintiff reported to Dr. Skale that she was "doing ok," although she was having crying spells for no reason and trouble sleeping. (Tr. 395). Dr. Skale reported that plaintiff was goal-oriented and her speech was normal. She had no plan or intent to harm herself or others. Dr. Skale diagnosed plaintiff with bipolar disorder II, cocaine abuse in remission, and PTSD. (Tr. 395, 397). She prescribed Depakote. (Tr. 396). Dr. Skale assigned plaintiff a GAF score of 55. (Tr. 397).

State agency medical consultant Michael Wagner reviewed the record on behalf of the state agency and completed a Psychiatric Review Technique on June 13, 2006. (Tr. 473-75, 459-69). He listed plaintiff's diagnoses as "major depressive disorder single episode" and "PTSD by history." (Tr. 459, 461). He determined that plaintiff had mild restriction of activities of daily

living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 466). The medical consultant further determined that the evidence did not establish the presence of the "C" criteria. (Tr. 467). He reported that plaintiff began receiving mental health treatment in January 2006 for major depressive disorder with history of PTSD and that she initiated treatment after her husband was incarcerated, she had lost her housing, and she was forced to place her children with her mother, who had been abusive to her as a child; plaintiff was taking Remeron for her depression; and plaintiff's therapist reported that her depression was primarily situational and would be relieved when plaintiff had stable housing and her children were returned to her. (Tr. 468). The medical consultant stated that treatment notes from May 2006 disclosed that plaintiff was in her own apartment, she reported she was sleeping much better, she was not having crying spells, her energy level was better, and she was getting out more. (*Id.*). He found plaintiff to be partially credible and gave weight to her treating source. (*Id.*). The medical consultant concluded her mental health impairment was not severe at that time. (*Id.*). State agency medical consultant Dr. Bruce Goldsmith, Ph.D., affirmed the assessment as written on November 6, 2006. (Tr. 472).

State agency medical consultant Dr. Joan Williams, Ph.D., reviewed the record and completed a Psychiatric Review Technique on August 21, 2008. (Tr. 443-456). She rated plaintiff as having mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation, each of extended duration. (Tr. 453). Dr. Williams determined that the evidence did not establish the presence of the "C" criteria. (Tr.

12

454).

Dr. Williams also completed a mental RFC assessment. (Tr. 457-58, 470-71). She determined that plaintiff was moderately limited in the following areas: the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. (Tr. 457-58).

Dr. Williams reported that as to plaintiff's daily activities, plaintiff lived with her family, cared for her personal needs, cooked twice a day, cleaned, did laundry, shopped, used public transportation, watched television, went to movies, read books and worked puzzles. (Tr. 470). She also noted that plaintiff had a history of cocaine dependence but reportedly had been clean for two years. (*Id.*). Dr. Williams found plaintiff's statements to be partially credible. (*Id.*).

Dr. Williams concluded as follows:

The evidence does not identify work-like activity as a central stressor for [plaintiff], but rather personal attachment issues as such. The evidence supports intact capacity for simple to moderately complex tasks. [Plaintiff] retains attention, concentration, and persistence to sustain a routine of work-like activities. She can relate superficially with others and can adapt to simple changes on the job.

(*Id.*).

13

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

14

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since July 7, 2003, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: lumbar disc disease, major depression/bipolar disorder, history of PTSD, and history of cocaine dependence (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds the claimant has the following residual functional capacity (based on Exhibits 20F and 21F/19): She can lift or carry up to 10 pounds frequently and 20 pounds occasionally; she can stand or walk for six hours and sit for six hours in a normal eight-hour workday; she can occasionally stoop, crouch, kneel, and crawl; but she should never be required to climb ladders, ropes, or scaffolds. The claimant has the capacity to perform simple to moderately complex tasks; she retains attention, concentration and persistence to sustain a routine of work-like activities; she can relate superficially with others; and she can adapt to simple changes on the job.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565

and 416.965).[7]

7. Born [in] . . . 1972, the claimant was 30 years old on the alleged onset date, which is defined as a "younger individual age 18-49" (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. There are no acquired work skills transferable to jobs within the claimant's residual functional capacity (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).[8]

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 7, 2003, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-19).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

---

[7]Plaintiff's past relevant work was as a nurse assistant. (Tr. 18).

[8]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the unskilled light jobs of cashier (12,000 regional positions and 1.5 million national positions), cleaner/housekeeper (1,500 regional positions and 250,000 national positions), and assembler (6,000 regional positions and 675,000 national positions).

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

**D. Specific Errors**

On appeal, plaintiff argues that: (1) the ALJ erred by failing to consider plaintiff's obesity impairment and to evaluate the condition pursuant to Social Security Ruling 02-01p; (2) the ALJ erred by discrediting the opinion of Dr. Holbrook, in violation of Social Security Ruling 96-6p; and (3) the ALJ erred by failing to obtain the testimony of a medical expert to address the severity of plaintiff's psychiatric impairments and the limitations, if any, resulting from those impairments.

**1. The ALJ did not err by failing to evaluate plaintiff's obesity.**

Plaintiff argues that the ALJ failed to comply with the requirements of SSR 02-01p, 2000 WL 628049, because she failed to: (1) consider what impact plaintiff's obesity has on her lower back impairment, and (2) consider the impact of plaintiff's obesity on her overall ability to perform work-related duties. (Doc. 5 at 2-3). In response, the Commissioner contends that the

ALJ complied with SSR 02-1p by acknowledging the findings of examining physician Dr. Bailey

that plaintiff is morbidly obese and obesity contributes to her symptoms, and relying on Dr.

Bailey's findings as to plaintiff's limitations in formulating the RFC. (Doc. 8 at 12, citing Tr.

18).

SSR 02-01p recognizes that obesity may affect an individual's ability to perform the

exertional functions of sitting, standing, walking, lifting, carrying, pushing, and pulling, as well

as an individual's ability to perform postural functions such as climbing, balancing, stooping,

and crouching. SSR 02-01p, 2000 WL 628049, at *6. SSR 02-01p does not mandate a

particular mode of analysis for an obese disability claimant. *Bledsoe v. Barnhart*, 165 F. App'x

408, 412 (6th Cir. 2006). Rather, the Ruling simply recognizes that "obesity, in combination

with other impairments, 'may' increase the severity of the other limitations." *Id.* at 418 (quoting

SSR 02-1p).

Here, the record shows that the ALJ adequately considered plaintiff's obesity in

formulating the RFC by relying on the opinion of a physician, Dr. Bailey, who explicitly

accounted for plaintiff's obesity. When examining plaintiff in May 2006, Dr. Bailey noted that

at five feet tall and 214 pounds, plaintiff was morbidly obese. (Tr. 202). Dr. Bailey diagnosed

plaintiff with (1) morbid obesity, and (2) chronic back pain with "mild" left-sided radiculopathy.

(Tr. 204). Dr. Bailey found that plaintiff's "obesity contributes to her symptoms, and weight

reduction would diminish her complaints." (*Id.*). The ALJ made explicit mention of Dr.

Bailey's obesity findings in her decision. (Tr. 15, citing Tr. 202-04). The ALJ also made clear

in her decision that she credited Dr. Bailey's report. The ALJ expressly stated that she was

giving "considerable weight" to the opinions of the non-examining state agency physicians and

that the rationale for the limitations these physicians found was Dr. Bailey's opinion as to plaintiff's limitations based on her consultative examination findings.[9] (Tr. 18, citing Tr. 433-34, 204). Thus, the record demonstrates that the ALJ utilized the opinion of Dr. Bailey in fashioning plaintiff's RFC and thereby incorporated into the RFC assessment the effect that obesity has on plaintiff's ability to work. *See Coldiron v. Commissioner of Social Security,* 391 F. App'x 435, 443 (6th Cir. 2010) (by utilizing opinions of physicians who explicitly accounted for the claimant's obesity when fashioning the RFC, the ALJ incorporated into the RFC the effect obesity has on the claimant's ability to work). *See also Bledsoe,* 165 F. App'x at 412 ("[T]he ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity.").

Given the absence of any evidence that plaintiff's obesity has increased the severity of her limitations to a greater extent than assessed by Dr. Bailey in her report, the record demonstrates the ALJ adequately accounted for plaintiff's obesity in formulating the RFC. *See Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x 411, 416 (6th Cir. 2011) (the ALJ did not err by failing to consider the plaintiff's obesity where the plaintiff did not present any evidence from any physician that described her as obese or any opinion that her weight imposed additional limitations upon her or exacerbated her other conditions). Plaintiff's first assignment of error should be overruled.

---

[9]The non-examining medical consultants determined that plaintiff could perform the exertional requirements of light work, except for no climbing of ladders, ropes or scaffolds and no more than occasional stooping, kneeling, crouching and crawling, while Dr. Bailey determined that plaintiff was capable of performing "a mild to moderate" amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects. (Tr. 433-34, 204).

19

## 2. The ALJ did not err by discounting the opinion of Dr. Holbrook.

Plaintiff alleges as her second assignment of error that the ALJ erred by discounting the opinion of one-time examining physician Dr. Walter Holbrook in violation of SSR 96-6p, 1996 WL 374180.[10] Plaintiff contends that Dr. Holbrook's findings are well-supported by medically accepted clinical and laboratory diagnostic techniques and are consistent with substantial medical evidence in the record, including: (1) a July 16, 2006 neurological evaluation for back pain performed at Christ Hospital which revealed diminished sensation in the left lower extremity to light touch and absent reflexes in the right and left patellas (Doc. 5 at 4, citing Tr. 223-24); (2) a July 15, 2006 neurological examination from University Hospital which revealed a slight decrease in strength at flexion/extension of the toe, ankle, knee and hip on the left as compared to the right; tenderness to palpation over the left SI joint, and positive straight leg raising on the left (*Id.* at 5, citing Tr. 211-12); (3) one-time examining physician Dr. Bailey's findings of paraspinous muscle spasm on the left, straight leg raising diminished to 30 degrees on the left, lateral motion of the spine diminished to 20 degrees on the right and 15 degrees on the left, and numbness over the dorsum of the left thigh and gluteal region (*Id.*, citing Tr. 203); and (4) the findings of chiropractor Dr. Tim McCrossen, who treated plaintiff from January 11, 2006 until February 6, 2006, of decreased lumbar range of motion, positive straight leg raising for pain on the left, and taut and tender muscle fibers in the lumbar area on palpation.[11] (*Id.* at 5-6, citing Tr. 190-98).

---

[10]Plaintiff does not explain the relevance of SSR 96-6p, which concerns the ALJ's consideration of findings of fact made by state agency medical consultants and program physicians, to Dr. Holbrook's opinion and how the ALJ violated this Ruling by discounting Dr. Holbrook's findings.

[11]Plaintiff includes among Dr. McCrossen's "findings" symptoms which plaintiff reported to Dr. McCrossen. Those self-reported symptoms are not listed here.

In response, the Commissioner contends that the ALJ reasonably relied on a dearth of medical evidence from the period close to the date Dr. Holbrook issued his opinion, together with a lack of evidence to corroborate plaintiff's representations to Holbrook concerning the treatment she had received, to discount Dr. Holbrook's opinion. (Doc. 8 at 14-15).

The ALJ did not credit the RFC assessments for sedentary work issued in 2004 by Dr. Holbrook, who examined plaintiff one time while she was incarcerated, and by the non-examining medical consultant Dr. McCloud, who adopted the limitations found by Dr. Holbrook. (Tr. 18). The ALJ determined she was not bound by those assessments, which had been issued in connection with a prior claim for disability benefits filed by plaintiff in 2004 that was denied initially and never appealed. (*Id.*). The ALJ determined that Dr. Holbrook's findings were not corroborated by any other medical practitioners around that time, and the ALJ specifically noted that two physicians whose names plaintiff supplied reported having no records on her. (*Id.*, citing Tr. 171-72). The ALJ also relied on the absence of any evidence to corroborate plaintiff's representations to Dr. Holbrook that she had received epidural injections, gone to physical therapy, and seen two neurosurgeons, as well as the fact that there was no MRI report from September 2003 in the record. (*Id.*). The ALJ decided to instead give considerable weight to the opinions of the state agency medical consultants, who the ALJ found relied on the examination findings of Dr. Bailey as support for the limitations they imposed. (*Id.*, citing Tr. 433-34).

The opinion of a non-treating but examining source is entitled to less weight than the opinion of a treating source, but is generally entitled to more weight than the opinion of a source who has not examined the claimant. *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504, 514 (6th

21

Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). When deciding what weight to give a non-treating source's opinion, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson*, 378 F.3d at 544. Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(d)(3).

The ALJ's decision to discount the opinion of Dr. Holbrook finds substantial support in the record. The ALJ reasonably determined that Dr. Holbrook's opinion was not consistent with the record as a whole. First, there is no medical evidence showing that plaintiff had received treatment for her back impairment at the time Dr. Holbrook issued his report and no evidence supporting plaintiff's representations to Dr. Holbrook that she had undergone any diagnostic testing prior to his assessment. Moreover, as the ALJ noted, although plaintiff has seen chiropractors, treatment for her back impairment has been sporadic since Dr. Holbrook issued his report. (Tr. 17). According to the July 15, 2006 University Hospital emergency room report, plaintiff had failed to establish herself with a family practice clinic as of that date despite having been advised to do so during an emergency room visit four months earlier, and plaintiff was not on any medication for her back at that time. (Tr. 211). There is no record evidence that plaintiff saw a physician for her back pain following the 2006 emergency room visits until July

of 2008, and at that time she rated her pain as only a "4" on a scale of "1-10." (Tr. 17, citing Tr. 390).

Second, although plaintiff correctly notes that the medical evidence includes a number of positive findings regarding her back impairment, the ALJ was not compelled to adopt Dr. Holbrook's RFC assessment for sedentary work based on these findings. Rather, the record discloses that the findings were generally mild. At her 2006 University Hospital emergency room visit, the examining physician found left leg weakness but was of the opinion it was not "radicular in nature" as plaintiff "was able to ambulate without difficulty in and out of the exam room with no apparent left leg weakness." (Tr. 212). A Christ Hospital emergency room report from the following day states that the pain plaintiff was experiencing was an exacerbation of her chronic back pain "temporarily related" to plaintiff not taking her pain medication for a few days after running out of it. (Tr. 224-25). In addition, plaintiff's chiropractor, Dr. McCrossen, reported some improvement on plaintiff's last visit in February 2006 ("Motion palpation revealed improved motion of the L5-S1 vertebral motor unit with trigger [points] palpated in the lumbar musculature.") (Tr. 192). Finally, while Dr. Bailey made some positive findings, neither she nor any other physician who examined plaintiff after Dr. Holbrook's evaluation in 2004 determined that plaintiff was restricted to sedentary work based on their findings.

Thus, the ALJ considered the pertinent factors under 20 C.F.R. § 404.1527(d) and reasonably decided to discount Dr. Holbrook's RFC assessment for sedentary work based on its lack of consistency with the evidence of record. Substantial evidence supports the ALJ's decision in this regard, and plaintiff's second assignment of error therefore should be overruled.

**3. The ALJ did not err by failing to obtain a consultative psychological examination**.

Plaintiff alleges that the ALJ erred by failing to request a consultative examination by a mental health specialist to determine the limitations, if any, imposed by plaintiff's psychological impairments. Plaintiff contends that the ALJ was not entitled to rely on the assessment of Dr. Williams, who evaluated the file on or about August 21, 2008 (Tr. 443-471), or the 2006 assessment of state agency medical consultant Michael Wagner (Tr. 473), as affirmed by state agency medical consultant Dr. Goldsmith. (Tr. 472). Plaintiff contends that none of these specialists ever examined plaintiff and none of them had the opportunity to review medical evidence submitted after the dates of their reviews, so that their opinions were stale. (Doc. 5 at 6-7, citing 20 C.F.R. §§ 404.1527(d)(6), 416.927(d)(6)).

In response, the Commissioner contends that the ALJ did not err by failing to order a consultative exam because there was sufficient evidence in the record for the ALJ to determine the limitations imposed by plaintiff's mental impairments. (Doc. 8 at 15-17).

The ALJ has the discretion to determine whether additional medical evidence such as consultative examinations or testing is required. *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917) ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we *may* ask you to have one or more physical or mental examinations or tests.") (emphasis added); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not

24

contain sufficient evidence to make a determination.")).

Here, the ALJ did not abuse her discretion by failing to order a consultative psychological examination. There was sufficient evidence in the record regarding plaintiff's mental impairments for the ALJ to determine the limitations imposed by those impairments. This evidence included the treatment records of plaintiff's mental health care providers and the report and assessment of the state agency medical consultant, Dr. Williams, which the ALJ credited. (Tr. 16, citing Tr. 453). Plaintiff has not shown that Dr. Williams' report was "stale" or that it failed to take into account pertinent evidence concerning plaintiff's mental impairments. To the contrary, Dr. Williams issued her assessment in August of 2008, only months before the January 2009 ALJ hearing. Dr. Williams conducted a thorough review of the psychological evidence of record, setting forth in her report the following evidence spanning the period from January 2006 until June 2008:

> 1/06- diagnosis of major depressive disorder with depressed mood and reported symptoms of feeling hopeless and easily overwhelmed, but plaintiff had normal speech, organized thoughts, and no psychosis, and she was goal directed
>
> 5/06- plaintiff was doing well with medications, she was cooperative, and she was stable
>
> 12/06- plaintiff overdosed (relationship stressors)
>
> 1/07- plaintiff overdosed (relationship stressors)
>
> 8/07 - plaintiff's mood was good but she had racing thoughts, she was tearful and agitated, and she had poor concentration and poor motivation, but she had no thoughts of suicide
>
> 9/07- plaintiff's mood was stable, she had better concentration, racing thoughts were decreased, she was calm overall, and her mood and affect were within normal limits
>
> 10/07- plaintiff was doing well and her symptoms had improved with medication

25

6/08- on emergency room visit to obtain her medications, plaintiff's appearance was adequate, her mood was euthymic, her thoughts were goal-directed, she was alert and oriented, her memory was intact, and her insight and judgment were fair

(Tr. 470). Plaintiff does not point to additional evidence concerning her mental impairments that Dr. Williams did not consider or that the ALJ failed to take into account. Accordingly, the ALJ did not err by failing to order a consultative psychological examination, and plaintiff's third assignment of error should be overruled.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 2/15/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ALYCE BROWN,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-123
Dlott, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).